Thank you, Your Honor. My name is Nat Man Shea. I'm here on behalf of the Arizona Justice Project and pleased and proud to be here for Ronnie Vera and also present are his mother and brother and other family members in support. Well. Habeas corpus is admittedly reserved for those who've been grievously wronged. Ronnie Vera, 16-year-old boy of limited intelligence with no criminal background, became one of the grievously wronged in 1995. I'd like to start with a couple of questions, a couple of issues that I don't think the Court needs to reach but need to be addressed just in case. The first is the Eighth Amendment issue. And I bring that up because, as I'm sure Your Honor saw, I filed a correction recently because Ronnie was sentenced under a statute that was changed a year early in the briefs of the Eighth Amendment.  is not the only statute in Arizona that chronically referred to the sentence as life with possibility of parole in 25 years. In fact, in 1994, Arizona changed the law to eliminate parole. So the only possibility for him to be released is by pardon or executive clemency. Well, no. That doesn't sound right, because obviously you can't sentence juveniles to, you know, for the rest of their lives at this point. But so if he doesn't have parole, does that mean he gets out after 25 years? No. It means that he only gets out if the governor pardons him or grants him executive clemency, and Arizona has no structure in place for cases like his to apply for any sort of release. So the main issue is, that I bring up, is that this is really like Florida v. Graham that was decided last year, because I looked at that last night and the Court said, at 130 Supreme Court, at 2021, at the beginning, that Florida eliminated parole and, therefore, the only hope Graham had of ever being released was executive clemency. And the Court subsequently, at 2027, said the remote possibility does not mitigate the harshness of the penalty. And that's exactly the situation Ronnie Vera is in. So you're right, Your Honor, he cannot be sentenced to life without parole, and that is what his sentence is under Arizona law as it was changed in 1994 and his crime was a year late. Well, I'm going to ask the government about that. So you might want to save time and rebuttal. Sure. Depending on what the situation is here. Sure. I will do that, Your Honor. The second issue I wanted to briefly mention is the Shackling issue, because what seems to have gotten lost is that the Shackling case. I'm going to start there. Was he shackled or was he under the law? I mean, he wasn't like, I think the issue that you were raising was that someone accidentally showed that he had some handcuffs on, but he didn't, you know, he wasn't shackled to the floor, was he? Oh, no, no, Your Honor. He was being moved. All right. So I don't know if that means shackling. It wasn't a Hannibal Lecter situation. I mean, the terms can be important, because shackling is a different situation than what you're talking about. Okay. I guess, yes. Oh, there were handcuffs, right? Handcuffs. And I'm not sure the record was clear as to whether he was also wearing ankle chains. But it was also brief and inadvertent, was it not? It was. And so held the California court. I'm sorry? And the California court so found. Arizona, Your Honor. But, yes. Excuse me. I'm sorry. This is an Arizona case. Well, the Arizona court so found on direct appeal said that Ronnie had not shown prejudice. At the first opportunity, then in the following post-conviction petition, we located and received affidavits from two jurors, both of whom said they had seen the chains, one of whom said, I don't think they would have him handcuffed like that or shackled like that if he wasn't guilty. And the other said, I don't think they would have done that if he hadn't shot somebody. So there was clear prejudice. However, the State court simply said, well, first, that issue has already been decided. And it clearly had not because the new evidence from the jurors had not been considered. Well, that evidence was all available. You knew who the jurors were. And that evidence was all available previously. And basically what they said, it wasn't in the record before the reviewing court and they weren't going to take new evidence. Isn't that right? No, Your Honor. I don't believe that is. I think what they said is it's already been decided on direct appeal. Had they said, well, it's not newly discovered under State law, then they might have had a problem for us, but they didn't say that. And it also, it was essentially a new issue. They said. Raised the issue, the evidence was available, and then later, after you lost the issue, then you wanted to add something else, right? And they shut you down. They said, we're not going to consider affidavits that weren't before. That's, again, Your Honor, I have to disagree. What they said was it's been decided on direct appeal. It would be different, I think, if they had said this is precluded because it's not newly discovered. They didn't say that. They said it had already been decided. And secondly, that, well, there was no reason for him to be chained anyway, which turns the whole thing on his head. I mean, if there was a reason for him to be shackled, then the State might have a position, but there wasn't. And these jurors were plainly prejudiced, and it was not precluded under State law. And I think it's very much like Gent v. Woodward, Woodford, that this Court decided, the exception being that in Woodford there was an evidentiary hearing, so those jurors could be called, but their affidavits clearly demonstrate their prejudice. And finally, and of course, I'm here to answer questions, but to me, the biggest issue and the most compelling issue is the sufficiency of the evidence. And I recognize how difficult the standards are to reach that, that no rational trier of fact could have found it under Jackson, and that the decision is unreasonably applied under AEDPA. But this is that case. This is that rare case. Because no matter what the standard is, every inmate, including Ronnie Vera, has the right to a careful and accurate review of the record to see if the elements are met. And it's that kind of review that was done in Wannach v. Allen that's cited in the briefs, and also in Sarosad v. Porter in Judge Callahan's dissent from the denial of rehearing in Bonk, which was essentially largely adopted by the Supreme Court, was a review of the particular evidence at issue. And here, the State court, and with all due respect, the State, has just sort of brushed over the evidence and not looked at the particulars, and that's what we did in our briefs. And the other thing that's important to note is that there's a lot of evidence in the State court. There's a lot of evidence in the State court. There's a lot of evidence in the State court. And there's a lot of evidence in the State court that's not in the State court. And so you can't just look at it your particular way. But just in looking at that, you focus on the fact that Mr. Vera told the police that he and Mr. Valencia intended to steal just one bike. But at other times, Vera mentioned bikes, quote, unquote, plural. Then also, for a convict's liability, why isn't it enough for Mr. Vera to have stood watch, warned Mr. Valencia, and then thrown a bike at the victim before running away? I mean, this is a, you know, he can say, okay, I didn't, you know, and because the theory that he was found guilty under isn't that he shot the victim, it's that essentially you've got the, you know, it's sort of that it was foreseeable in terms of when you're going out and you're stealing things that your accomplice is going to commit. And that's exactly what happened. Sure. And foreseeability applies to felony murder, but it doesn't apply to accomplice liability under Arizona law. Well, but you don't have to do everything that your accomplice does. That's right. But what you do have to do is you have to have the intent that the burglary is going to be committed. You have to either advise or actively assist the commission of the burglary. Well, I guess that's what I'm saying. Why isn't it enough that he stood watch, warned Mr. Valencia, and then he threw a bike at the victim before running away? That's what I'm getting to, Your Honor, because, first of all, the burglary is complete when Valencia enters, any part of his body enters the patio. So Ronnie Vera's assistance had to come before that. So he didn't do anything. I mean, his statements were perfectly consistent. And what the State is asking the Court to do is ignore all the truth of everything else Ronnie Vera said, but say that he was lying when he said just one bike, that he was lying when he said that Valencia said hold on and got off the bike and walked away and didn't tell him, didn't say what he was going to do. Now, as far as the warning, again, that comes after the burglary is completed, so it would be over anyway. And going back to the specifics, what Ronnie said was, I heard a noise and I told Greg. So there is, there are reasonable inferences and then there is speculation. And this case is like 1H. This case is actually stronger than 1H because if you compare them, 1H, and that involved an intent to aid a murder as opposed to a burglary, but 1H had a motive against the victims. And Ronnie Vera has no motive here. Well, excuse me, counsel, wasn't there kind of a general agreement between them that they were going to, they were with their buddies and then they decided it was boring and then they decided to go out and steal some bikes? And they stole one bike and then they were riding around together apparently on another bike. And then this fellow saw an opportunity, so he says, hold on, jumps off and goes in to make the attempt that ultimately caused the tragedy here. I mean, at what point, you know, does, I mean, I can understand it if you were arguing here that he had essentially quit the, I know this wasn't a conspiracy case, but he quit the conspiracy, so to speak, and was headed home. And then his friend went out and did this thing and Arizona was trying to hold him to the situation. But he was actually still there. They were still cruising around. And then there was this general agreement that they were going to steal some bikes. And so they kind of come across this opportunity and the guys go, oh, there he goes. And then he's standing there, as Judge Callahan has pointed out, and he hears, you know, he's kind of keeping watch and he hears the, I'm viewing the evidence as a light most favorable to the government. He hears the rustling and then he says, well, watch out, watch out, you know. I mean, this is the argument. And that would make him guilty, and it's very much like State v. Johnson that cited the briefs, of being an accessory after the fact, but not being guilty of the burden. No, but you've jumped over my point. What about the original agreement that they were going to go out, which doesn't seem like he ever withdrew from? Well, first of all, I don't think that's accurate, that the officer said, well, you were going to get bikes, and he did not he said just the one. But they didn't believe him. That's the problem. The jury didn't believe him. Well, Your Honor. I mean, that's the problem. That's your side of the case. But the other side of the case is he still, if he was just going out to get a bike, why was he there when the second burglary of the bikes was going on? The jury was entitled. You know, we have to give all the inferences in favor of the verdict. Sure. But they went, stole one bike. They went to the friend, December Cox's house. And then they're riding away. All right. Make your appellate argument, not your jury argument. Make your appellate argument here. Well, Your Honor, there is no – for Ronnie Vera to be guilty, the reasonable inferences have to support that he knew that Valencia was going to commit that particular burglary. It's not enough to say, well, we were going to go take some bikes. I think the best way to approach this would be tell us why there's – what – why is there only way to look at these, one way to look at these facts? Because the only evidence of guilt, the only evidence that convict him is to say we're going to believe that he went and took the first bike, which he said, that they rode around, which he said, that it was about 30 minutes that he said, that everything he said was true, except that it wasn't true that he said we only went to steal one And there's no reason – why is he going to lie? It's not reasonable. He's a 16-year-old kid that has no motive to say, okay, yeah, I stole one bike, and I went with my friend, and he got the other one, and then I went and sat down, or then I went and tried to leave through the bike at the guy, and my friend shot him. Why is he going to lie about whether he knew his friend is going to get a second bike? But even if he knew it, and even if he stood there while his friend did it, he had to actively assist him in some way. And the – Thank you. Thank you, counsel. I think we understand your argument. Your time has expired. Thank you, Your Honor. And I – We'll hear from the State now. I hope to reserve some time, but thank you. Good morning. Good morning. Can you talk about – Counsel, would you please introduce yourself for the record? I'm sorry. My name is Alan Amon, and I represent the State of Arizona.   Petitioner's argument hinders principally on the statement that he made in a post-incident interview, where he said that he went to the complex to steal just the one bicycle. But there are other portions of the interview that support the inference that they had a general plan to steal more than just one. And Petitioner said that before they went to the complex, he described either himself or Valencia as asking themselves whether they should go to the complex to steal the bicycle, to steal the bikes. And when they went there the first time around, Petitioner said that he stole the first bicycle by entering a patio and handing it over the patio wall to his co-defendant. He termed that bicycle his bike. He said, that one was mine. Approximately 30 minutes later, they are still at the complex, which raises the question of why they are still there if they had already achieved their mission of trying to steal just one bike. And true to form, the co-defendant jumped into a second patio, and Petitioner goes to a dark spot, his own words, a dark spot, and he alerted the co-defendant when the victim was approaching. In describing the second bicycle that the co-defendant tried to take, he said that we, he used the word we, failed to get that bicycle because the victim came up at that time. I think, though, the statement and the conduct surrounding his own description of the crime and his own conduct surrounding it establish a sufficiency of the evidence under the Jackson standard, and especially under the dual layer of deference that's owed under the AEDPA. I would like to move on to the Eighth Amendment claim. Scalia. The second counsel. I think Judge had a question.  I wanted you to go. It's where you're going. I wanted to know about the Eighth Amendment claim, and that my understanding of Appellant's argument is he's saying that the sentence is now the equivalent of life without the possibility of parole, and therefore, you can't sentence we now know you can't sentence juveniles to life without the possibility of parole. So what is the structure in Arizona? And I realize this was raised in a 28-J letter, so you, I would just like your response. Okay. It appears that Arizona abolished parole the year before Petitioner's Offensive. Starting in 1994, January 1st, 1994, parole was not available. You can still apply to the Board of Executive Clemency for commutation or pardon. The sentencing made in entry refers to 25 years to life, 25 years before or without the possibility of parole. It seems that the language is imprecise. It should have said 25 years with no possibility of release. So that's where the sentence stands at this point. It is unclear exactly if Petitioner, if what exactly the legal ramifications are of that sentencing made in entry with that, with the wording that it has in turn compared to the statutory backdrop. And so this ties into one argument under the Eighth Amendment that we feel is crucial, which is that if the Petitioner is alleging that his sentence violates Miller v. Alabama, well, that is a different legal theory than a general gross disproportionality claim, which is what Petitioner has been asserting all along. And so for that reason, this is a claim that he will first need to present in the State court, first before it becomes reviewable on habeas. What would the position of the State of Arizona be under those circumstances? I'm sorry. What is the question? What would the position of the State of Arizona be with respect to the sentence that the Petitioner is alleging violates Miller v. Alabama? Is that the only possibility of release is commutation or pardoning by the Governor after application to the Board of Executive Clemency. Right now, there is no statutory mechanism for parole since the offense was committed after January 1st. So then you agree with Mr. Shea. Do I understand that correctly? Yes, I believe so. But that does not automatically compel relief because Miller v. Alabama, again, is a different legal theory that needs to go to the State courts first. And this is a question that's particularly suited for State court resolution because it raises a subset question, subsidiary question, such as retroactivity. It is our position that Miller v. Alabama is not retroactive to cases outlawed in collateral review, which his case was. And so that is a question that's suited for State court resolution first, especially in light of Danforth v. Minnesota, which said that State courts can give a new ruling, a new Supreme Court ruling and expand the definition of retroactivity than that which is dictated by Teague v. Lane. So if the State courts were to find Miller retroactive and applicable to petition or sentence, I would move the issue before it comes to this Court after it has been thoroughly presented. So you're basically saying he's raising it for the first time in a 28J letter without a record for us to review? I'm sorry, 28J letter? Are you talking about the letter that he filed last week? Yes. Well, yes, that's one thing. Because the claim hasn't been presented in the State court, we haven't had an opportunity for briefing on this issue and the important questions that are related to it, such as retroactivity. You actually haven't had even an opportunity to brief it here. Yes. So Miller puts out — I mean, setting aside the claim of a per se violation of Miller, which should go to the State courts first, a sentence of 25 years to life, 25 years, no possibility of release, does not violate clearly established Supreme Court precedent as it stood at the time of the sentence. But, Counsel, the problem I have with that is that in reality, he was sentenced to life in prison. He was not sentenced to 25 years to life. Well, 25 years, that is when the potential for release kicks in, which is commutation or pardon. It takes out parole, but there is still the availability of commutation or pardon or a — He could have a commutation tomorrow morning. Well, in Arizona, we have what is a natural life sentence, which is a life sentence with no possibility for release on any basis whatsoever. And then we have a 25 to life, which is when the possibility for release kicks in after 25 years. Yes, but if the law has changed, it's the equivalent of a natural life sentence, is it not? I'm sorry. A natural life sentence means no possibility of commutation. A 25 to life sentence means there is a — you can apply to the Board of Executive and the governor, and she can approve it or disapprove it. So what — maybe I'm misunderstanding this. I think this is where we're kind of hung up. What I think my esteemed colleague was suggesting is that the governor or maybe the — could commute or pardon him tomorrow if the governor chose to do so. Am I wrong? Is that — No. So the governor has no authority under Arizona law to commute or pardon until 25 years. Is that what you're saying? That's right. Right. It takes 25 years before you can apply for commutation. If you have a natural life sentence, then you must serve it in full for the rest of your natural life. Counsel, what is your authority for that? It's the 13-752. Well, since this wasn't really properly briefed or raised here, if he filed something in State court to do that at this point, would you then object because he didn't do it before? No. Arizona Rule of Criminal Procedure 32.1D, I think, provides for — you can file a successive petition for post-conviction relief based on a new rule, a new rule of constitutional law that has been made retroactive to cases on collateral appeal. So that's why you would — the petitioner could, you know, use that avenue as a vehicle to raise that claim. That dissent, as it is now, currently violates Miller v. Alabama. So there is an avenue to have that claim heard in State court. Okay. I would like to — Anything further, counsel? Sure. I would like to address briefly the handcuff issue, the shackling issue. All right. What happened was when the jurors took a break and the defendant was being led outside the courtroom, and when they opened — the bailiff opened the door to the hallway, the jurors seemingly took a brief, afflating glance at petitioner in handcuff. The deputy, the bailiff, told the trial court about it, and then the trial court asked counsel, gave counsel an opportunity to elaborate on the record, to develop the record on this point. Counsel declined and just moved for a mistrial. And so when the case went to the Arizona Court of Appeals on direct appeal, that was the record before the State court at that time, and that was the record upon which they based their ruling. Now, the Supreme Court has held that when we evaluate the reasonableness of a State court ruling, we are necessarily limited to the record that was before the State court at the time. And so the record that was before the State court at that time was sufficient to — it supports their ruling that the defendant did not show any actual precedent. The defendant had the opportunity to question the jurors to develop a factual record, and he declined. And his argument was that precedents should be presumed. And the case law does not support that argument. And there's a case that we've cited in our brief, again, v. Wordford, which says that a brief, fleeting glance, a glimpse of the petitioner in handcuff does not establish that precedent is necessary to find a constitutional violation. Anything further, counsel? If there are no questions remaining, I'll go ahead and take a seat. Roberts. No further questions. Thank you very much, counsel. Thank you. The case just argued will be submitted for decision. And we will hear argument next in United States, X. Rel. Jodelsky v. Kaplan. Thank you, counsel. Just a minute. All right. Very well. Thank you. Very well. Thank you. Counsel, you may proceed, and please introduce yourself for the record. Yes. Good morning. My name is Michael Aguirre, and I represent the appellants. You want to lift up the mic a little bit?  Is that better? I think that's better, yes. Thank you. Mr. Aguirre, I gather you were substituting for Maria Severson, who was counsel of record? She's my law partner. Very well. Our firm is the counsel of record. Very well. Please forgive me, Your Honors. I was over in the other courtroom admiring how beautiful it was and having wonderful conversations until I realized I'm in the wrong courtroom. All right. Very well. I'm so sorry to interrupt. You're here on time. Thank you. Well, thank you very much. Thoreau said that some circumstantial evidence is more powerful than others. And he gave us an example, trout in the milk. In this case, eight years ago, a low-level...
judges: Ezra, O'scannlain, Callahan